All right, let's take up the next 10 o'clock case, Hand v. Randolph County. We've got Mr. Dunn for the appellate. In the police department, my name is Daryl Dunn and I'm representing Steve Hand. In terms of the underlying probing facts, I'm not sure that there's a lot of this data. My client initially did work for the county of Randolph County. For a number of years, he had one worker's compensation claim, a lapse in complaint in 2005. He continued to work and then he was injured at work and was not able to work. Pursuant to his own treating doctor's restrictions, he exhausted his 12-week FMOA rights. And then under the applicable policy that was enforced by the county, he was put on inactive status. He was not able to return to work or did not return to work for one year. And then, although the policy itself doesn't flat out say that he's terminated, it basically said that he was no longer in active service and I don't think it's going to be disputed that that was in effect. He subsequently filed a worker's compensation claim, but he filed a complaint alleging a telephony discharge. And so, there's no question, I think we agree and are agreed, that if you look at a literal application of the policy, the county filed the policy, and under a literal application of the policy, if that's all the analysis that the court is going to perform at this level, then the termination would be valid. Now, we contend, and I do not read the county's brief to disagree, that the mere fact that a policy is neutral on its face, in and of itself, doesn't give the county a complaint defense to a retaliatory discharge claim. And I cite a couple of examples, admittedly they're extreme examples, but one of the examples I give is that if the county had a policy that if somebody, after they were employed by the policy, tested positive for carpal tunnel syndrome, that's an event that could result in the employee's termination. Well, a policy such as that just begs for scrutiny as to the reason for the policy. Why do we have the policy? What's the business justification for the policy? Is there some reason for the policy other than the fact that you've got an employee that has been injured while working for you? And so, I'm almost anticipating a question here. Do you want to ask a question, Your Honor? I'll ask it already. Oh, I'm sorry. I probably am going to ask some questions, but I'm letting you go for a while. So, then the question is, what kind of information do you have to produce in order to survive a motion for summary discharge? That's really the question that needs to be resolved by this court. And, you know, unfortunately, there just isn't a lot of case law. And is the answer none? You produce nothing and you survive summary discharge? As a place where I wish the answer was yes, but I don't think that's going to be something that's going to... Isn't that the problem here, Mr. Dunn? I mean, okay. I mean, the Supreme Court has said that a discharge based on a neutral absenteeism policy, you know, is not retaliatory discharge in effect. Now, so they come forward and they say we have this neutral absenteeism policy. If you can't come back to work in a year, we can discharge you without violating your rights. Don't you have to produce something then to show that there is some retaliatory motive or workers' comp motive? Or don't you have to produce something to create a genuine issue of material fact to avoid summary judgment? Well, Your Honor, I cite numerous cases in both of my briefs that say, that hold, that the Illinois courts do not adopt a per se rule. That is essentially what the county was arguing is we got a neutral policy, we win. There's numerous courts that have held... Then is there a genuine issue of material fact for the court to try? I mean, don't you have to show, for example, you know, in the last 10 years 20 people have been discharged under this policy and 19 of them had filed workers' compensation claims or, you know, so-and-so who was not discharged under the policy had been hurt in an auto accident rather than workers' comp and they didn't discharge that person. I mean, if you've got anything like that, then, you know, there's an issue. An inference could be drawn that they're applying it in a discriminatory fashion even though it's neutral on its face. I think there's two ways, Your Honor, that I think and that I'm urging that this court should look at and embrace to say that if you've got this kind of evidence, that's sufficient for a jury to conclude that the purpose of the policy is not some kind of legitimate business reason, but it's really the purpose of the policy is really to target employees that have gotten to become injured at work. Don't you have to have some proof of that? Well, I think so, and I think there's two ways they can do it. Number one is, and it wasn't fleshed out in great detail in the brief, but if you look at the record C-51 through C-55, I asked in interrogatories the very question that you suggested. I said it was interrogatory, I believe it was number 12, but then incorporates number 11, it goes all the way back to 6. Number 6 said, what was the reason why Ham was discharged? And the response is, well, he violated the absenteeism policy. And then number 11 is, well, what other employee, you know, give us other employees other than Ham that have been discharged under the policy. And then if you look at interrogatories 11 and 12, and I get one response, one other fellow, and that is a fellow that was working on moonlighting at the Sparta Police Department, and he got injured while working at the Sparta Police Department. So here we got the only two people that have been discharged pursuant to this policy in this county are people that have been injured at work. That's 100%. Now, I don't know whether that's... And is there any evidence that that's... Well... I mean, you get into things usually on these kind of cases where it's a question of whether it's a statistically significant number based on the number of employees and so forth. I know it's 100% of everybody who's... this policy's been applied to. But is there anybody, for example, like I said earlier, are there employees who were injured in some other way and were not discharged? There's no evidence of like that. There's no evidence of that. There's no evidence in the record one way or the other with regard to that. Certainly the county hasn't induced any of that evidence in this record. The other is that in the Hess v. Clay Court case, we had a very similar issue that was raised. The employee was challenging the bona fides of the absenteeism policy. Now, it was tried before the trial court. The trial court concluded that the absenteeism policy was a valid exercise of the employer's right to terminate an employee for absenteeism. Now, one of the things, though, and in fact the only criteria that the Hess court looked at, it says the trial court made a finding, and this is something that the trial court should do, is find out, well, what is the legitimate business reason for the policy? It seems to me that that's... you know, why do you have the policy? Certainly the county's not going to say, well, we have the policy because we don't like people that are injured at work, so this gives us a pretext to fire them. They're not going to say that. Nobody's that... they're just not going to do that, but is there a legitimate business reason for the policy? So I send out a Rule 206A1 notice, and I ask the county to designate a witness that can talk to me about the policy itself, its application, and the business justification for it, and whether or not other alternatives could have satisfied the county's business needs and at the same time preserved Ham's position. So I take her deposition. The deposition is in the record. The relevant parts of it, if the court would be interested, is at seat 107 to 116. There's a lengthy exchange between me and Witness Best. Now, Mr. Paulson, on redirect, tried to rehabilitate her and say, well, you're not the one that promulgated the policy, and you don't really know about this policy, and I had to start a deposition. I got her to admit at the end. Now, wait a minute. I sent a 206A1 notice. You're the designated person. You're going to tell me about this policy and why you've got it. And at a salient point in the deposition, I basically asked her, why do you have the policy? What's the business justification for it? Why can't you just let Mr. Ham stay on inactive status until he either retires, takes Social Security, or he's able to manage it back to work? And the answer is, well, she didn't know. She didn't know. So here we have a situation where we've got a policy in place, the county's designated witness doesn't know the reasons why the policy is there. Now, I would suggest, in my position, that's why I took the appeal, that that should be a sufficient basis where a jury could infer that the reason for this policy is to, it's targeted at, it's to get at people like him because they don't know why the policy is there. There's no business justification for it. It's just there. Now, don't we pretty much all know what the business justification of it is and what the courts have said, why it's a legitimate thing to have an absenteeism policy like that? And basically it's because employers can't, employers should not, according to, I'm not saying I agree or disagree with this, but what the courts have held is that you can't expect an employer to keep a job open forever for somebody, regardless of how they were hurt. At some point they have to replace them. There is no case that I can find anywhere, well, I withdraw that. Unfortunately, in the Seventh Circuit you've got a Dotson opinion that's applying Illinois retaliatory discharge law that takes that position, but the Dotson case is supposedly interpreting Illinois law. Well, you look at the Dotson case and it very rarely even cites an Illinois case. There's no Illinois case that simply says, as a business justification, you can't keep a job open forever. There's no case that says that. If this court says, as a matter of law, that your business justification is that we don't have, we just can't keep a job open forever, this would be, to my knowledge, it's my belief, that this would be the first and only court that so held. Now, and I want to make it very clear, we're not saying, and this is what was, we argued in our brief and that's what I talked to Ms. Best about in her deposition, we're not saying, never have said, that the county has to keep that job open for my client. Okay? And I think there's obvious reasons for that, particularly even if it's a large employer that employs thousands and thousands of people and there's a huge turnover, I wouldn't even argue that somebody like the tire manufacturer or continental tire has to keep a job open. But what was being proposed and the question I asked is, okay, can you retain the inactive status until such time as he is able to give you a full duty release and there are jobs available? No, that this man was not on any, didn't have any health benefits, they weren't paying any health coverage for him, they were not spending one penny on this guy, Mr. Hamm, while he was off work. And I asked her, I said, is there any reason why you just can't keep him on inactive status until he gives up and realizes he can't ever come back to work there or he retires or he winds up taking some kind of social security? And I asked her, is there any reason for that? She didn't know what it was. She said, well, I just don't think that's good business practice. Is there any case law or anything that says that an inference of retaliatory motive can be drawn from the fact that the employer did not use some less drastic means than discharge? I mean, you're wanting to rewrite their policy for them and say, you didn't have to discharge him, you could have put him on inactive status. I mean, is there anything that says they have to do, I mean, there's case law that says they can discharge him under a neutral absenteeism policy. If in the case law, I would say, Your Honor, and I guess I would, you know, flesh out the cases here. There are, there is cases out there that says an absenteeism policy can be the basis for a discharge, but in the record in those cases, there wasn't any effort made by the plaintiff in that case to challenge the bona fides of the policy and say what the business justification was for it or what is the application of the policy. Does it only catch people that have been injured at work? There was no record made like that at all. So given the fact that the plaintiff made no effort, then it was logical that that's what the court was going to hold. I'm not trying to rewrite this policy. They've got a policy that says you're on inactive status. What I'm challenging is the one year provision that says automatically you're done. Now, their own physician, their own I.D. and I.M.E. physician, I mean, you can find this at page C170 of the record, this is what their own physician says. This is about six months after the one year expired. He says, I see no reason he needs to be on any restrictions and this man can go back to work. And then he has in his own affidavit, he says that he believes he can go back to work. And this is after the discharge, I guess. He became able to go back to work. Exactly. Now, the point is, here we've got a guy that if they didn't have this inviolate one year rule, could have gone back to work. Their own doctor says he could go back to work. He believes he could go back to work. And they say he's terminated. Now, they will say, well, okay, he can reapply for the position, but you just read the policy. The policy is found at C127 in the record and it's in both briefs. Basically says, well, he just gets to reapply like any other employee if there's a vacancy there. But here we've got somebody that's actually been, he's not being terminated for bad work habits. He's been a good employee. He's shown that he can do the job, he just happened to be injured. You would think it would make a lot of sense from a business perspective that you would want to rehire employees, you would want to bring people back in to the workforce that have proven they can do the job. But why? So I ask the question, why? Why do you want to terminate this guy? Why can't you, if there's jobs available, why can't you put him back on once he can show you that he can do the work? And he says, well, we don't know. I don't know why. Don't know what the justification is. Well, now we've got, I think, a jury question. Both the Cercuca case, which is, which I cite in my brief, and the Clemens case talks about these neutral, allegedly neutral business policies. And both of them came up after a trial on merits. In both of those cases, they say it's the prior fact that has the liberty. It's the prior fact that will be given the ability to decide whether or not this policy is a valid business justification. So aren't you essentially saying that there should never be a summary judgment, that there can never be a neutral, a neutral reason for one of these absenteeism rules? I have no doubt, Your Honor, that if either you or any of the three judges, if you had been the appointed 206A1 witness that had been appointed to give the testimony for the county, you could have come up with numerous business justifications. Well, I understand that she didn't come up with anything. But does that in any way show that it wasn't neutral, her absence of testimony? I think the fact, as I say, here's what the case is about. My guy gets fired. And essentially he says, okay, why'd you fire him? He says, well, you violated our absenteeism policy. He says, well, you know, why do you have the policy? And they say, well, I don't know. Now, you know, that doesn't work with my children. That doesn't work with my clients. That doesn't work anywhere but apparently in Randolph County. He says, I don't know why we have it. That's why we have it. You violated it. You're done. Now, if they can't come up with a reason why they have it, I think a jury should be allowed to hear that evidence and say, here's their witness. She doesn't know why they've got the rule. And then I should be able to argue with the jury, well, here's why she doesn't want it. Say that the reason is because there isn't a valid reason. They're using it. They're using it to get rid of people that have been injured at work. And then we've got the answer to the interrogatory with regard to the police officer that was injured at Sparta. And I think that's enough. I think that's why we have juries to make these factual determinations. There's an inference that can be raised there. Otherwise, and so I see. I can't figure this case out. I just don't understand how there's just nothing to pursue here. Now, I'm a big believer that summary judgment is an extraordinary remedy and shouldn't be given lightly. But here we have a case where this employee was injured on two different occasions that culminated in the one injury, and it was in 08 and 2010. Now, he continued to work with some absences for seven years until he had surgery in 2011. And then his surgeon testified, this under oath, that there's no way he could ever come back to work at Randolph-County. In fact, he got awarded $100,000 based on his surgeon's testimony that he could never do the job of a maintenance man at the corpus. That because of the restrictions from his right ankle, which he got 45% loss of use of the right ankle, as well as 35% loss of the body as a whole. And as of this date, he settled that case in February of 2014, saying that he couldn't work. But yet, Mr. Donald has filed this lawsuit saying somehow we retaliated against him. How can you retaliate against someone who there's no why would we retaliate against him? He can't work anyway. And it's permanent. That's not, oh, he might get better. He accepted a settlement. He signed it under the understanding that he had all this loss of use of his body and his ankle where he can't work no matter what. And, of course, there's business decisions. The person I produced actually did say there was business reasons, but she indicated that she didn't formulate the policy because she's not the county board. She's the head of HR. And what they were thinking when they passed the policy, she wasn't sure. That's a question I had about the record. What does the record show about where this policy came from? Was it passed by the county board? Yes. And how long ago? I mean, was it? It wasn't terribly long, but I mean, it was, I want to say within five, six years or so. It hadn't been in place for 30 years. I mean, there was a governmental process that culminated in this policy. There was an ordinance, county ordinance or something. And I would argue, obviously, they have two names, man, for the entire array of the county courthouse and jail. You can't go without one forever without having them in place. And, obviously, but I don't believe you'll see it. Let me just finish this, okay, if I can. And was this ordinance or policy or whatever that was passed by the county board, is that in the record? Yes, and it's in the cursive. I'm just asking, does it have any kind of preamble or anything that reveals anything about the reason for it? I don't believe it has. I mean, sometimes those kind of things will start off and say, you know, recognizing that absenteeism is a problem and et cetera, et cetera, et cetera.  Okay. But I would tell you that I think the Supreme Court has been clear that we don't even have to give, if we have a neutral absenteeism policy on the space, we don't even have to give a business reason. And that's the law. I mean, whether you like it or not, Mr. Gunn wants to create law, which, you know, is all good and fine, but simply not the law. We don't have to give a business reason, even though it's obvious what the business reason would be. And the reason they're willing to keep him on inactive status for a year is for purposes of seniority. Yeah, they're not getting benefits, but once that year's up, it's like, well, is it fair to let this guy come back five years from now and still maintain his seniority, whether it's within the union or not? So that's the purpose of the inactive status. If this client wants to, he can apply for any job in the realm of accounting, and if he's qualified and he happens to be hired, then fine. You know his PD's been terminated. Yeah, he's been terminated. And according to his doctor, as late as February of 2014, which was six years, five years after the injury, he still couldn't come back to work. And that's why he got a 46% loss of use of his right foot, and his surgeon testified that he could permanently never, ever do the job of the maintenance. So where's the issue here? Either this is a fraud that works compensation settlement in that he thinks somehow his doctor was lying or that he gets a settlement that he says, oh, fine, now I can go back to work. The doctor testified he couldn't, so I don't know where he could come up with some kind of motive or showing that somehow we retaliated against him when his doctor's been saying all along he can't come back to work. Well, I think Mr. Dunham said that some other doctor says he can go back to work. Was that the same doctor? No. Okay, well, you've got two different doctors' opinions. That's what we're looking for. Right on. Cowie did an interview, like they always do, and, you know, obviously, the Cowie's doctor said, oh, I think he can go back to work, which maybe he can, maybe he can't. But the fact is, his own assumption is saying he can never do that job again. Okay, are you telling me that the two sides' doctors disagreed about his ability to go back to work? Yes, I did. Shocking. Anyway, I mean, I understand Mr. Dunham's argument, but it's just not based on the case law. And, again, I don't think summary judgments should be given out without strong scrutiny. But in this case, I just can't see how. There's just absolutely no proof of anything. And when you get proof of nothing, and we don't have to show a business purpose, even though it's obvious what they are, he just simply has nothing. He doesn't have a smoking gun. He has nothing. And, yes, this policy has been applied to everyone. And I believe he may be right that it was only one other person who fell under this policy, and it could have been a workers' comp case. I don't know. But it's applied easily, and there's been no evidence that someone who was not hurt via workers' comp or whatever, that somehow they were allowed to stay long because it's just not the case. The evidence is that it's been applied evenly when it's come up to anybody. And I just – there's just nothing here. That's all I have unless you have more questions. Thank you, counsel. Mr. Dunham, a rebuttal? Yes, please. You know, Mr. Paulson keeps talking about my client's doctor said he can't work. Well, he kind of waved his hands a little bit. Well, the county's doctor said he could. And that's why we have a dispute. That's why we let juries decide these things in terms of the damage element in terms of future wages. The reason that he can't work was not the reason given why he was terminated. The reason it was why he was terminated is because he ran afoul of his absenteeism policy, couldn't come back to work within a year. No reason ever given by Ms. Best or answer to any rioters, anything like that, the reason that he was terminated is because he can't work. In fact, he's filed an affidavit that he's basically mentally feeling better. He believes he can work. Do you agree that this is a policy that was passed by the county board? Yes. And, I mean, Ms. Best or whatever her name is or the HR person, I mean, she's obligated to follow it, isn't she? I mean, the county board passed the policy. The policy's there. I mean, what does it matter to her why they passed the policy? She's got to follow it, doesn't she? I asked for somebody to testify about the policy, 201-206A1. She's the one that they offered. She's the one I asked my questions to. And at the start of the deposition, I said, did you read this notice? Can you answer all these questions? At the end of the deposition, did you read this notice? Can you answer all these questions? Are you testifying on behalf of the policy as to all these reasons? She said, yes. And I can't do any better than that. I do want to point out in the Hess case, to answer Justice Chapman's point, that in the Hess case, the appellate court affirmed the trial court's ruling that there was a business justification. In that case, the employer had been paying health care benefits, health care premiums. And the reason offered in that case was, look, if we keep these people on, the health care costs are going to eat us up. And the appellate court found, and I think correctly so, look, that's a valid business justification why you can't keep non-productive people on the payroll. But in this case, nothing like that has been offered. They're not paying these health care benefits. The seniority point, there's been nothing in this record that would indicate that seniority accumulates while an employee is on inactive status. So I don't see, and if that's what the business justification is, it's the first time it's been offered by counsel and not in his best on appeal. In the end, if you look at the closing argument of Mr. Paulson's brief, basically they're saying, we don't have to offer a business justification. All we have to do is fire the person and say that we've conformed with the policy. Well, then we really are to the point that we're not letting the plaintiff investigate the motives for the policy. I tried to investigate the motives for the policy. Their witness says, we don't know why we got, I don't know why we got the policy. Jury should be allowed to decide this case. Thank you. Thank you, counsel. We'll take this case under advisement and enter a written disposition in due course. Let's take a short, we're going to take a short recess before we call the 11 o'clock court meeting.